UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>v.                             )<br>)<br>JONATHAN MITCHELL, JAMES GARDNER, )<br>PHILIP ALBERT JR., JARED KNOWLTON, ET AL )<br>Defendants, )<br>) | **CRIMINAL ACTION**<br>**NO. 04-1809-CBS** |

**MEMORANDUM OF PROBABLE CAUSE**
**July 26, 2004**

**SWARTWOOD, M.J.**

I.  Nature of the Offense and the Government's Motion

On June 29, 2004, a Criminal Complaint was filed, charging Jonathan Mitchell ("Mr. Mitchell"), James Gardner ("Mr. Gardner"), Philip Albert Jr. ("Mr. Albert"), Jared Knowlton ("Mr. Knowlton") (collectively "Defendants") and others, with conspiracy to distribute oxycodone, a Schedule II controlled substance, and knowingly and intentionally distributing oxycodone, a Schedule II controlled substance, in violation of 21 U.S.C. §§846 and 841(a)(1).

At these Defendants' initial appearance on June 30, 2004, they were advised of their right to a preliminary examination in accordance with Fed. R. Crim. P. 5.1 and the Government moved for

a detention hearing in accordance with 18 U.S.C. §§3142(f)(1)(C)(Defendants are charged with an offense for which a maximum term of imprisonment of ten years or more is prescribed in the "Controlled Substances Act"), and (f)(2)(A)(risk of flight).

Subsequently, each of these Defendants was released on conditions and their probable cause hearing was continued to July 23, 2004. At this hearing, Steven C. Story, Special Agent with the Drug Enforcement Administration, testified on behalf of the Government and was cross-examined by Defendants' counsel.

## II.  Findings of Fact

1.   Special Agent Story is the case agent in connection with an investigation concerning the distribution of OxyContin in the North Shore area of Massachusetts. This investigation commenced in October 2003 and concluded on June 30, 2004 with the arrest of more than thirteen Defendants. During this investigation, Special Agent Story and other law enforcement officials involved in this investigation used confidential informants, undercover agents, surveillance of individuals and locations, pen register/trap and trace devices and recorded and monitored controlled purchases of oxycodone.

2.   Over a several month period from October 29, 2003 to June 10, 2004, five undercover law enforcement agents ("UCs") established themselves as purchasers (and possible suppliers) of substantial amounts of oxycodone in the Gloucester, Massachusetts area. During this period, in sixteen separate transactions, the

UCs purchased more than eleven hundred 80 mg OxyContin tablets[1]. Gov't Ex. 1.

3. **Jared Knowlton:**

On December 2, 2003, Mr. Knowlton and two other co-defendants were involved in the sale of 100 OxyContin pills to undercover agents. At the conclusion of this transaction, one of the undercover agents handed $5,500 to Mr. Knowlton in payment for the 100 OxyContin pills.

4. **Jonathan Mitchell:**

On November 25, 2003, Mr. Mitchell was present with two other co-defendants when undercover agents purchased what they thought were 100 OxyContin pills, but turned out to be only 98 OxyContin pills, for $5,500. Following this transaction, surveilling law enforcement officials saw Mr. Mitchell, alone in his truck, counting cash.

5. On December 12, 2003, Mr. Mitchell delivered 100 OxyContin pills to an apartment in the Riverdale Park Housing Development which were then sold to undercover agents. One of those agents then handed Mr. Mitchell $5,300.

6. **Philip Albert Jr.:**

At a consensually recorded meeting on November 4, 2003, a co-defendant told undercover agents that Mr. Albert was his alternative source of supply for OxyContin pills. On November 5,

---

[1] OxyContin is a brand name for oxycodone.

2003, this same co-defendant met with Mr. Albert and after driving around the block in Mr. Albert's motor vehicle, delivered 10 OxyContin pills to undercover agents.

7. In April 2004, undercover agents negotiated directly with Mr. Albert for the purchase of OxyContin pills. Those negotiations were never successfully concluded.

8. **James Gardner:**

On December 2, 2003, at the time of a OxyContin sale with another co-defendant, surveilling law enforcement officers observed Mr. Gardner alone in his truck for approximately forty-five minutes, conducting what appeared to be counter-surveillance for the co-defendant then completing that transaction.

9. On January 6, 2004, undercover agents were with a co-defendant waiting for the co-defendant's supplier to deliver a quantity of OxyContin pills. Eventually, after several calls, Mr. Gardner arrived at the co-defendant's apartment complex, was observed exiting his vehicle and entering the co-defendant's apartment. Within a couple of minutes, the co-defendant then returned to the undercover agents' apartment with a quantity of OxyContin pills.

### III. Probable Cause

I find that there is probable cause for the offenses charged against these Defendants in this Complaint. Mr. Knowlton was involved in the sale of 100 OxyContin pills on December 2, 2003 to

undercover agents; Mr. Mitchell was involved in the sale of OxyContin pills on November 25, 2003 and December 12, 2003 to undercover agents; Mr. Albert was involved in the sale of OxyContin pills to an undercover agent on November 5, 2003; and Mr. Gardner was involved performing counter-surveillance on December 2, 2003, during an OxyContin sale to undercover agents and on January 6, 2004 was observed going to a co-defendant's apartment who was waiting for the delivery of OxyContin pills.  After Mr. Gardner arrived at the co-defendant's apartment, the co-defendant then went to the undercover agent's apartment and delivered the OxyContin pills.

/s/Charles B. Swartwood, III
CHARLES B. SWARTWOOD, III
MAGISTRATE JUDGE